**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 92-8092**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**REUBEN COLEMAN, and MILTON R. PERRY,**

**Defendants-Appellants.**

_____

Appeals from the United States District Court
for the Western District of Texas
_____

July 30, 1993

Before REYNALDO G. GARZA, WILLIAMS and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Reuben Coleman and Milton Perry were convicted of a variety of conspiracy and substantive offenses arising out of a series of loan transactions at Lamar Savings Association where they were employed as loan officer and an executive vice president.

After a jury trial they were both found guilty of conspiracy to defraud the United States, misapply funds, make false entries and statements to the FHLBB and of actually making such statements and entries in violation of 18 U.S.C. § 1001, 18 U.S.C. § 657, and 18 U.S.C. § 1006.

Appellants now assert multiple errors involving the disqualification of counsel and a certain juror, various

"inflammatory" statements by the government, limitations on cross-examination by the defense, and a $9,265,829 restitution order. This court finds no merit in the complaints relating to appellants' convictions. We do conclude, however, that the restitution order was barred by the previous civil settlement between the appellants and FDIC.

## BACKGROUND

In response to growing instability in the savings and loan industry, the FHLBB--the federal regulatory agency for thrift institutions--moved to tighten capitalization requirements in 1985. Lamar Savings Association, where Coleman and Perry worked, found it increasingly difficult to meet these requirements. Lamar was at the time repossessing a variety of non-earning real estate properties. The FHLBB required an institution to boost its net worth by 20% of the value of each repossessed property (REO) on the books. Lamar was therefore forced into a position of having to increase its assets or reduce its liabilities by selling the REOs.

Lamar officers decided to try to bypass the requirements.[1] Pursuant to the conspiracy, the appellants allegedly fashioned transactions that would appear as bona-fide sales of REO properties but were, in fact, sham loans designed to thwart FHLBB interference. These transactions involved the sale of REO properties held by Lamar, paid with loans furnished by Lamar. The purchaser-borrowers were assured they would have no personal

---

[1] This court has previously considered the underlying facts in U.S. v. Parekh, 926 F.2d 402 (5th Cir. 1991).

2

liability. The sale would remove the REO properties from the books of Lamar and augment the apparent net worth of the institution. The conspiracy ended on December 31, 1985, just before Lamar was taken over by the federal authorities and became insolvent.

On August 7, 1990, a 14-count indictment was returned in federal court for conspiracy and substantive offenses arising out of five of these "sham" real estate transactions. After a thirteen-day jury trial followed by eight days of deliberations, Perry and Coleman were found guilty of seven counts and acquitted of another seven. Both men received terms of imprisonment and other penalties and were also ordered to pay restitution of $9,265,829. The numerous issues they have raised on appeal will be discussed one by one.

## DISCUSSION

### A.

Coleman asserts that the district court erroneously disqualified his previous defense counsel David Botsford at a pre-trial hearing in 1991. Coleman complains that the court's abrupt action prejudicially subverted his sixth amendment right to counsel. A district court's disqualification ruling is reviewed for abuse of discretion. Wheat v. United States, 486 U.S. 153, 163-64, 108 S. Ct. 1692, 100 L.Ed.2d 140 (1988); United States v. Reeves, 892 F.2d 1223, 1227 (5th Cir. 1990).

Coleman's contention that the government did not follow the proper procedure for disqualification is irrelevant. The district court had the authority and duty to inquire sua sponte

into whether counsel should not serve because of a conflict with another client. Such findings are within his prerogative. Wheat, 486 U.S. at 160, 108 S. Ct. at 1698; In re Gopman, 531 F.2d 262, 266 (5th Cir. 1976).

Coleman also contests the substantive basis for Judge Nowlin's decision. The court stated that during the ongoing criminal prosecution and parallel civil litigation against Lamar Savings officials there developed a pattern of last-minute cross-over substitutions of counsel.[2] Botsford's prior representation of Adams, the president of Lamar Savings and a codefendant with Coleman, presented a conflict with Coleman's best interests and an appearance of impropriety, and Botsford's involvement in the earlier grand jury investigation made it likely that he would be called to testify against his former client Adams. In the district court's view, the waivers offered by Botsford and Adams could not have cured these pervasive conflicts. Based on such reasonable inferences and findings, we do not discern an abuse of discretion.

Finally, Botsford was not deprived of the opportunity to dispute his disqualification with the judge. Botsford presented his position both in open court and by means of a sealed ex parte affidavit that the court reviewed in camera. Additionally, after

---

[2] Attorney Henry Novak originally represented Coleman after his indictment and represented Adams and Perry as grand jury targets. He represented all three men in the related civil case. Botsford also represented Adams at the time. Novak withdrew from representing Coleman, and Coleman sought to retain Botsford, a motion initially approved by the district court. Botsford also represented a grand jury witness who had been a public relations representative for Adams.

4

the initial order of disqualification, Botsford filed two motions to reconsider his disqualification, which the court addressed in a written order. Neither of Botsford's motions to reconsider alleges lack of notice, nor is there any evidence that the court lacked any relevant information in making his decision.

**B.**

The next issue raised by appellants is the effect of the introduction of evidence suggesting that government witness Vijay Parekh was convicted for his part in the conspiracy. We review the admission of evidence at trial for abuse of discretion. United States v. Lindell, 881 F.2d 1313 (5th Cir. 1989), cert. denied, 496 U.S. 926, 110 S. Ct. 2621, 110 L.Ed.2d 642 (1990); United States v. Anderson, 933 F.2d 1261, 1268 (5th Cir. 1991). Although evidence of an accomplice's guilty plea may be prejudicial, United States v. Miranda, 593 F.2d 590, 594 (5th Cir. 1979), it is admissible if the evidence serves a legitimate purpose and is coupled with a cautionary jury instruction. United States v. Valley, 928 F.2d 130, 133 (5th Cir. 1991). Such an instruction was delivered here.

One legitimate purpose of this testimony is to "blunt the sword" of the defense counsel's cross examination. United States v. Leach, 918 F.2d 464, 467 (5th Cir. 1990), cert. denied, 111 S. Ct. 2802, 115 L.Ed.2d 976 (1991). In this case, the government asked Parekh if he was a felon in order to preempt defense counsel's impeaching his credibility before the jury. Details of the conviction were not elicited. Coleman asserts that the government may not rely upon Leach because he did not intend to

impeach Parekh.  Coleman's mere intention, however, is not enough to trump the government's rights under Leach.  United States v. Valley, 928 F.2d 130, 134 (5th Cir. 1991) (defense counsel must make "unequivocal commitment not to raise the convictions of co-defendants").

The other reference to Parekh's conviction arose during testimony of another defense witness who expressed his opinion about Parekh's ownership of certain property.  After stating his belief that Parekh was the owner, the witness was asked during cross-examination if he was aware that twelve people were of a different opinion.  The witness answered affirmatively.  In fact, it was on re-direct that Coleman's attorney elicited that a jury had found Parekh had not been the owner.  The only questions which showed that a jury convicted Parekh of a related transaction were propounded by the defense counsel.  This cannot therefore be reversible error.  Leach, 918 F.2d at 467.  The admission of testimony about Parekh's criminal conviction was not erroneous.

## C.

Appellants next argue that the court erred in limiting their cross-examination of two witnesses, Louis Reese and Mary Arnette.  Rulings limiting the scope or extent of cross-examination are committed to the sound discretion of the trial court and are reviewed only for abuse of discretion.  United States v. Barksdale-Contreras, 972 F.2d 111 (5th Cir. 1992), cert. denied, 113 S. Ct. 1060, 122 L.Ed.2d 366 (1993); Delaware v. Van Arsdall, 475 U.S.

6

673, 679, 106 S. Ct. 1431, 89 L.Ed.2d 674 (1986) (listing factors a judge may examine in limiting cross examination).

Coleman's complaint that he could not effectively cross-examine Reese because the court eventually cut off cross-examination altogether is meritless. The record indicates that the questioning of Reese was repetitive and cumulative of other evidence. Coleman fully presented his defensive theory and argued it to the jury, and he was given ample opportunity to challenge Reese's credibility. The court's action did not prejudice him.

Perry's complaints against Arnette are also easily resolved. Defense interrogation of Arnette was only limited about unidentified misconduct after she testified to her animosity toward Perry. The court held that to impeach her on other matters was collateral and cumulative of her hostility. The court did not abuse his discretion in limiting cross-examination; the jury received adequate information with which to evaluate her bias, credibility and vindictive proclivities.

**D.**

The jury instructions, Coleman next asserts, were erroneous because, by including suggestive illustrations of conduct that could "point to" intent to defraud, the instruction somehow eviscerated the requirement of finding such intent. Coleman specifically complains that some of the examples the court gave concerning the necessary intention to commit fraud under 18 U.S.C. §§ 657 and 1006 precisely tracked the government's proof. We review the instructions to the jury for abuse of discretion, United

7

States v. Chaney, 964 F.2d 437, 444 (5th Cir. 1992) and taken as a whole, United States v. Leal, 547 F.2d 1222-23 (5th Cir. 1977). A conviction will not be reversed unless the error in jury instructions incorrectly states the law or fails to instruct on applicable principles. Id. As a whole, the district court's instructions were correct. Only by stripping the illustrations from their context does the charge appear biased. Any advantage the government may have enjoyed from the listed examples considered in isolation was, however, limited by other instructions making it plain that willful, knowing intent to deceive or cheat is the appropriate standard.

## E.

Appellants challenge the court's decision to disqualify juror William Lord during the trial. Lord, originally a substitute juror himself, was removed after the government informed the court that Lord, a "bedroom" firearms dealer, was the subject of an investigation by the ATF as well as the subject of an ATF regulatory check in May 1990 concerning his sale of over 400 firearms.

A trial judge may "remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties have become impaired." United States v. Dominquez, 615 F.2d 1093, 1095 (5th Cir. 1980). We will not disturb the judge's finding on appeal except for "want of any factual support or for a legally irrelevant reason." United States v. Rodriquez, 573 F.2d 330, 332 (5th Cir. 1978). No evidentiary hearing is necessary, United

8

States v. Huntress, 956 F.2d 1309, 1312 (5th Cir. 1992) and the scope of the investigation is committed to the district court's sound discretion, United States v. Fryar, 867 F.2d 850 (5th Cir. 1989). In this case, Lord never mentioned his encounter with ATF during voir dire despite the government's questions about past troubles with any agency of the government. This omission supplied a sound basis for the court to strike him. Lord's failure to reveal his dispute with ATF deprived the government of its chance to effectively exercise a peremptory strike and might have demonstrated an anti-government bias.

**F.**

Perry contests the government's failure to disclose certain information concerning an offer made by the government witness, Harold Klinger, to federal prosecutors in Houston. Although he has cited no authority, Perry seems to be alleging a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). To prove a Brady violation, defendant must show that the prosecution suppressed evidence that was both favorable and material to the defense. United States v. Lanford, 838 F.2d 1351, 1355 (5th Cir. 1988). Appellants were given information about Klinger's offer the day after he testified.

There is no indication that the subject matter of Klinger's offer in Houston, which concerned another savings and loan company, had any relation to the transactions involved in this prosecution or any effect upon his willingness to testify in this case. Nor is there any suggestion that Klinger received

9

consideration for his offer in Houston, let alone for his testimony. Since there is no evidence that cross-examination of Klinger would have been more effective if appellants had earlier been given the information, there is no violation of Brady. United States v. Tarantino, 846 F.2d 1384, 1417, cert. denied, 488 U.S. 867, 109 S. Ct. 174, 102 L.Ed.2d 83 (1988).

**G.**

Appellants' final arguments concern the court's restitution order. We agree with their position that the FDIC's mutual release executed at the conclusion of a civil case against appellants and others foreclosed the government from obtaining a restitution order in this criminal prosecution.

The government seeks restitution pursuant to the Victim and Witness Protection Act, 18 U.S.C. § 3663. Although the government asserts that the purpose of section 3663 is exclusively punitive and does not depend on whether the victim waived or compromised its rights, this is not consistent with the text of the statute. Not only is the award of restitution discretionary with the court, § 3663(a)(1), but the amount of the award may be reduced to the extent a victim's property has been returned, § 3663(b)(1)(B)(ii), or to the extent a victim has received compensation, § 3663(e)(1). Whether restitution is punitive or compensatory, its imposition is subject to the trial court's broad discretion.

Further, in light of section 3663(e)(2)(A), which requires a setoff against a restitution order of damages paid in

10

any federal or state civil proceeding, this court has considered the effect of release and settlement agreements pursuant to those proceedings on subsequent liability for restitution. In United States. v. Allstar Industries, 962 F.2d 465, 477 (5th Cir. 1992), cert. denied 113 S. Ct. 377, 121 L.Ed.2d 288 (1992), this court stated that:

> While a court may offset restitution in a criminal's case by the amount of a civil settlement to avoid double recovery by victims, the availability of such an offset depends upon what payment was made in the settlement, whether the claims settled involved the same acts of the defendants as those that are predicates of their criminal convictions, and whether the payment satisfies the penal purposes the district court sought to impose. United States v. Rico Industries, Inc.,854 F.2d 710, 715 (5th Cir. 1988), cert. denied, 489 U.S. 1078, 109 S. Ct. 1529, 103 L.Ed.2d 834 (1989).

In Rico Industries, the court examined a restitution award following a civil settlement agreement. There the court held that "[i]f [the settlement] is based on the same acts, the object of restitution--to restore the property the party harmed--would indicate that [the Defendant] be credited with the amount of the settlement." 854 F.2d 710, 715 (1988).

The intent of FDIC's settlement with Coleman and Perry is clear and self-explanatory:

> Whereas, the FDIC and Perry desire to settle fully and finally all differences between them, relating to all claims and demands which are based in whole or in part upon the facts alleged in the FDIC case and/or upon directly

11

or indirectly Perry's tenure as an officer at Lamar.[3]

The settlement agreement then describes at length the types of charges, complaints, claims, and liabilities from which both parties are discharged. The government does not deny that claims arising from the transactions for which Coleman and Perry were criminally prosecuted were at issue and settled by this agreement in the civil case. The government's contention that the FDIC did not intend to settle all claims by the government including criminal restitution flies in the face of the unambiguous and all-inclusive language of the agreement. Further, the FDIC's contention that this did not serve the penal nature of a restitution award is contrary to the stipulation that FDIC and the parties desired to settle fully and finally all differences between them.

The government cites United States v. Cloud, 872 F.2d 846 (9th Cir. 1989), cert. denied, 493 U.S. 1002, 110 S. Ct. 561, 167 L.Ed.2d 556 (1989), for the proposition that stipulations in a settlement agreement concerning an indebtedness are not binding on the government's quest for restitution. In Cloud, however, the restitution was not ordered on behalf of a government agency which had signed a settlement agreement with the defendants covering the same transactions involved in the criminal case. Nor was the settlement agreement in Cloud adopted and signed by the government with the approval and participation of the same prosecutor who

_____

[3] There is no dispute that Coleman's settlement agreement contained the same language.

12

prosecuted the criminal action.  In this case, the same parties were involved in both criminal and civil proceedings.  FDIC cooperated closely with the U.S. Attorney's office to approve the settlement agreement with its broad, all-inclusive language.

Although "the law will not tolerate privately negotiated end runs around the criminal justice system" in the use of the VWPA, United States v. Savoie, 985 F.2d 612, 618 (1st Cir. 1993), that is not what happened here.  If there is any end run around the law, it is an end run fostered by FDIC in conjunction with the criminal prosecutors in this case.  We cannot affirm a restitution order that contradicts a carefully negotiated settlement agreement between the government and these defendants in a parallel matter.[4]

In conclusion, we **AFFIRM** the convictions of appellants and **REVERSE** that portion of the punishment that orders restitution of $9,265,829.  **AFFIRMED** in **PART**, **REVERSED** in **PART**.

---

[4]    We do not reach the question of the effect of a full release in a civil suit not involving the government on a subsequent criminal prosecution.  See e.g. U.S. v. Bruchey, 810 F.2d 456, 460 (4th Cir. 1987); U.S. v. Cloud, supra.