**STATE of Iowa, Appellee,**

v.

**Obell VANOVER, Appellant.**

**No. 95–1688.**

Supreme Court of Iowa.

Feb. 19, 1997.

Linda Del Gallo, State Appellate Defender, and John P. Messina, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Susan M. Crawford, Assistant Attorney General, John P. Sarcone, County Attorney, and Jamie Bowers, Assistant County Attorney, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and TERNUS, JJ.

LAVORATO, Justice.

A jury convicted the defendant, Obell Vanover, of conspiracy to deliver a controlled substance and possession of a controlled substance. His appeal presents the classic clash between a criminal defendant's Sixth Amendment right to counsel of defendant's choice and a trial court's need to maintain the highest ethical standards of professional responsibility in the courtroom. The issue is whether the district court abused its discretion when it disqualified Vanover's counsel because the State intended to call counsel as a witness to testify about a statement counsel took from a codefendant. In the statement the codefendant implicated herself and exonerated Vanover. Additionally, we must decide whether the district court abused its discretion in sentencing Vanover following his conviction.

Finding no abuse of discretion in either instance, we affirm.

I. *Background Facts and Proceedings.*

On the evening of November 2, 1994, Des Moines police were conducting an undercover narcotics investigation. One of the undercover officers agreed to purchase a small rock of crack cocaine from Ken Scoggins. Scoggins was unaware he was dealing with a police officer.

Other officers followed Scoggins to a nearby residence at 1114 Tenth Street where Scoggins purchased the cocaine to sell to the officer. Shortly after Scoggins delivered the cocaine to the undercover officer, the officers who had followed Scoggins arrested him on drug charges and jailed him.

The police immediately secured a search warrant for the Tenth Street premises and forced their way in. Once inside, the police found Obell Vanover, Tina Waters, Darrell Howard, and several others.

During the search, the police seized two grams of crack cocaine and $250 in cash from Waters' purse. They also seized a police scanner from the living room, a marijuana pipe from a coat pocket, and $220 in cash from Vanover's person. The police arrested and jailed Vanover and Waters on drug charges.

The following day Waters was released under the local pretrial release program. Vanover and Scoggins remained in jail.

The district court appointed the local public defender to represent Vanover. Later the

public defender withdrew. On November 10 the court appointed attorney Dean Stowers to represent Vanover. Apparently, Stowers had represented Vanover before on criminal matters.

On December 5 the court temporarily rescinded Stowers' appointment because of some misunderstanding about his eligibility for court appointments. The court reinstated Stowers as Vanover's attorney on December 29. Stowers, however, continued to provide legal consultation to Vanover between December 5 and December 29.

On November 10 Stowers visited Scoggins at the county jail. Stowers made the visit without first contacting Scoggins' attorney. Stowers convinced Scoggins to give Stowers a written statement about the events of November 2. In his statement Scoggins admitted purchasing the crack cocaine at the Tenth Street premises from a young black male. Scoggins, however, denied purchasing the cocaine from Vanover and denied Vanover was present when the purchase was made.

Four days later, at his office, Stowers met with Waters and interviewed her on tape. In her interview, which was transcribed, Waters stated that (1) the Tenth Street residence was her home, (2) Vanover had been staying with her for only a month before November 2, (3) Howard sold the crack cocaine to Scoggins for her on the evening of November 2, (4) she had been selling drugs at other times from her residence, (5) Vanover knew nothing about her drug activities, and (6) Vanover was not present when Scoggins purchased the cocaine at her home on November 2.

At the time of this interview, Waters had counsel. Stowers, however, did not inquire whether Waters had counsel. Only Stowers and Waters were present during the interview.

Stowers also interviewed Howard on the same day he interviewed Waters. In his statement, Howard admitted he sold the crack cocaine to Scoggins for Waters on the evening of November 2 at Waters' home. He also stated that Vanover was not present when this sale was made but arrived shortly before the police forced their way into Waters' home.

On December 16, in a single trial information, the State charged Waters, Scoggins, and Vanover with conspiracy to deliver crack cocaine and delivery of crack cocaine. The State also charged Waters and Vanover with one count of possession of crack cocaine with intent to deliver. By this time, Howard was nowhere to be found.

On January 19 Stowers testified at Vanover's parole revocation hearing on a separate charge and conviction. A different attorney represented Vanover at this hearing. Through Stowers, Vanover's parole counsel was able to admit into evidence the statements from Scoggins, Waters, and Howard.

The next day, the State listed Stowers as a witness in the present case. The State also filed supplemental minutes detailing Stowers' involvement in obtaining the three statements. The minutes further stated that Stowers had testified at Vanover's parole revocation hearing and that through Stowers' testimony Vanover's parole counsel was able to admit into evidence the three statements.

The State also listed Scoggins as a witness. The State filed supplemental minutes indicating that Scoggins had (1) reached a plea agreement with the State, (2) pleaded guilty to the pending drug charges against him, and (3) agreed to testify against Vanover. The minutes also stated that Scoggins would testify that he did not purchase the cocaine from Vanover on November 2 but had purchased cocaine from him about 100 times from October 1 to November 2, 1994. Finally, the minutes stated that Scoggins would testify that while in jail with Vanover, Vanover urged Scoggins not to testify against Vanover and threatened Scoggins if he did testify.

In the meantime, Waters and Vanover remained jointly charged as codefendants.

On January 26 Vanover filed a notice waiving his right to object to the foundation for introduction of the statements Stowers took from Scoggins, Waters, and Howard. Several days later Vanover filed a motion to sever his trial from Waters'. In his motion to sever, Vanover asserted that (1) none of the testimony the State sought to offer through Stowers was admissible against Vanover be-

cause it was hearsay; (2) only statements attributed to Waters were admissible against her; (3) the alleged improprieties by Stowers were groundless; (4) "the specter of the State calling [Vanover's] counsel as a witness on behalf of the State would result in a violation of [Vanover's] constitutional right to a fair trial;" (5) denying severance would cause Stowers to withdraw against Vanover's wishes and in violation of the Sixth Amendment right to counsel; and (6) "noticing attorney Stowers as a witness was not done in good faith for the purpose of eliciting admissible evidence; rather it was done for the purpose of disrupting [Vanover's] attorney-client relationship."

On February 13 the district court heard the motion to sever. Waters' attorney characterized Waters' statement to Stowers as a confession and alleged that either Stowers or Vanover may have coerced Waters to give it. The State argued that Stowers had become a witness for his client and against a codefendant. The State also argued that such problems with Stowers representing Vanover would exist in either a joint or severed trial.

Stowers responded to the State's arguments as follows:

I think the State is just wrong. I think that this is going to be a violation of my client's right to counsel of his choice under the Sixth Amendment if I am put in a situation—

I am going to tell the court right now I don't intend to withdraw, because I think that in order to preserve the record, if you don't grant the severance I am going to make the court or the county attorney take some action to get me to withdraw. And that might not be [a] completely consistent thing to do under the ethical rules, but that's what I'm going to do. So that that issue is going to have to be crossed at some point in time.

. . . .

And I am willing to represent Mr. Vanover. He wants me to represent him. I intend to represent him in this case. And that's where we are.

. . . .

The only conceivable need for my testimony on behalf of the State in a joint trial is this interview of Tina Waters, codefend-ant. An interview, of course, that the foundation for which I don't think is disputed. The circumstances under which it occurred I don't think are disputed.

In denying Vanover's motion to sever, the court stated:

Apparently [Stowers] took a recorded statement from a codefendant, Tina Waters. . . . Apparently the statement implicates Waters but does not implicate Vanover. The State has noticed the parties that they intend to call as a witness in their case in chief defendant's attorney, Dean Stowers. . . . Forcing the defendant's attorney to testify will result in [Stowers] being unable to continue as attorney for the defendant Vanover.

Stowers filed a request for clarification of the court's ruling. Stowers pointed out that there was no pending motion to disqualify or withdraw before the court at the time the court denied Vanover's motion to sever. The court responded:

Defendant in this request for clarification correctly states that at the time of the court's ruling there was "no motion to disqualify counsel for defendant Vanover and no motion to withdraw was pending before the Court. . . ." That is correct.

Now the defendant has requested the court to rule whether or not attorney Stowers should be terminated as the attorney for Vanover. To that question now the Court says "yes."

Attorney Stowers made himself a witness in this case by personally interviewing and taking a recorded statement from a codefendant in this case, Tina Waters. Apparently the statement implicates Waters but does not implicate Vanover. Waters was interviewed apparently at the time she had been charged with the crime and after she had obtained an attorney to represent her, without notifying her attorney.

Mr. Stowers is now a witness and will not be allowed to continue in both those capacities.

Now that the Court has been asked it is this Court's ruling and Order that attorney Stowers' services as attorney for defendant

Vanover are terminated and a new court appointed attorney will be provided.

On February 21 Vanover appeared with his newly-appointed counsel and requested the court to reconsider its decision to disqualify Stowers. When asked why he wanted Stowers to be his attorney, Vanover replied:

Because I am satisfied with the work he [has] done. He's a pretty good attorney with client-attorney confidentiality, and I respect the job he's done and I feel that he's a good lawyer, and I am ready to go to trial with the case. And I believe he can defend it. I don't have a problem with him getting up and testifying in my behalf. It may look bad on me by him being called as a witness. It may attack his credibility. But I am still satisfied with the work he [has] done and performed. And I still want [him] to continue as my attorney.

The district court refused to reinstate Stowers as Vanover's lawyer.

Waters eventually reached a plea agreement with the State and agreed to testify against Vanover. Vanover's new counsel moved to reconsider the court's ruling disqualifying Stowers. Counsel argued that Waters was no longer a codefendant and for that reason her recorded statement would not have to be introduced through Stowers. Vanover again testified he wanted Stowers as his attorney.

Again, the court refused to reinstate Stowers. In doing so, the court gave the following explanation:

[I] have forgotten who raised the issue of whether it was [a] violation of one of the code of ethics for lawyers to do what [Stowers] did.... But it certainly raised in my mind the appearance of unethical or impropriety that maybe should be looked into if someone gets all the facts. And I haven't taken the time to do that.

Beyond that, to put Mr. Stowers in a position of trying to represent this man with that in the back of his mind and with having to dance around when he examines these other witnesses who he talked with without the presence of counsel while they were codefendant[s] would be an injustice to this defendant, because he may not give his full effort in cross-examining or examining those witnesses.

At Vanover's trial, Waters testified for the State. Contrary to her statement to Stowers, Waters testified that she and Vanover were dealing drugs at her home from October 1 to November 2, 1994.

Vanover's counsel vigorously cross-examined Waters about her recorded statement to Stowers. Counsel was also able to secure an admission from Waters that her story changed after she learned Vanover was being unfaithful to her. She conceded during cross-examination that she had written Vanover telling him that he had hurt her and now she was going to hurt him.

Vanover's counsel called Stowers to testify about (1) the recorded statement Stowers took from Waters, (2) Waters' call to him to set up the interview, and (3) the circumstances surrounding the interview. During Stowers' testimony, Vanover's counsel introduced the transcript of Waters' statement to Stowers and played the tape of that statement for the jury to hear. The State cross-examined Stowers about the time frame during which he took the statement. Just prior to Stowers' testimony, the State agreed not to question Stowers about possible unethical conduct in obtaining Waters' statement.

The jury convicted Vanover of conspiracy to deliver crack cocaine and of a lesser included offense of possession of a controlled substance. The district court sentenced Vanover to an indeterminate ten-year term of imprisonment on the conspiracy conviction and to an indeterminate, concurrent one-year sentence on the possession conviction. The court doubled the ten-year sentence. *See* Iowa Code § 124.411(1) (1993). The court then ordered Vanover to serve a mandatory one-third minimum of the sentence. *See* Iowa Code § 124.413. (Before trial, the State amended the trial information to include a habitual drug offender allegation against Vanover.)

In his appeal, Vanover contends the district court deprived him of his Sixth Amendment right to counsel when the court disqualified Stowers on its own motion and subsequently refused Vanover's requests to

reinstate Stowers. Vanover also contends the district court failed to exercise its discretion in doubling his sentence under the habitual offender provision of Iowa Code section 124.411(1) and considered an impermissible factor in selecting the sentence.

## II. *Disqualification of Counsel.*

■ A. *Applicable law.* The Sixth Amendment to the Federal Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Fourteenth Amendment to the Federal Constitution makes this provision binding on the states. *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562, 566 (1975).

■ The purpose of this Sixth Amendment provision is to ensure that criminal defendants receive a fair trial. *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1696–97, 100 L.Ed.2d 140, 148 (1988). In reviewing Sixth Amendment claims, the focus is therefore "on the adversarial process, not on the accused's relationship with his lawyer as such." *Id.*

■ The accused has a presumptive right to counsel of choice. That right, however, is not absolute. *Id.* at 159, 164, 108 S.Ct. at 1697, 1699–700, 100 L.Ed.2d at 148–49, 152 ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); *United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993) ("accused ... does not have the absolute right to counsel of her own choosing"); *In re Paradyne Corp.,* 803 F.2d 604, 611 n. 16 (11th Cir.1986) (same); *United States v. Washington,* 797 F.2d 1461, 1465 (9th Cir.1986) (same); *United States v. Rankin,* 779 F.2d 956, 958 (3d Cir.1986) (same); *Wilson v. Mintzes,* 761 F.2d 275, 280 (6th Cir.1985) (same).

■ There are times when an accused's right to counsel of choice must yield to a greater interest in maintaining high standards of professional responsibility in the courtroom. A trial court may therefore disqualify counsel if necessary to preserve the integrity, fairness, and professionalism of tri-

al court proceedings. *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698, 100 L.Ed.2d at 149 ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."); *Locascio,* 6 F.3d at 931 (question of disqualification implicates not only accused's Sixth Amendment right but also interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial); *In re Paradyne Corp.,* 803 F.2d at 611 n. 16 (right to counsel of choice does not override broader societal interests in effective administration of justice); *Washington,* 797 F.2d at 1465 (right to counsel of choice must give way where its vindication would create a serious risk of undermining public confidence in the integrity of our legal system); *Rankin,* 779 F.2d at 958 (right to counsel of choice must be balanced against requirements of fair and proper administration of justice); *Killian v. Iowa Dist. Ct.,* 452 N.W.2d 426, 430 (Iowa 1990) (in reviewing disqualification issue, appellate courts must preserve balance between right to counsel of choice and the need to maintain highest ethical standards of professional responsibility).

■ In evaluating disqualification issues, trial courts

> must recognize a presumption in favor of [the accused's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152.

■ Although the accused may waive counsel's conflict of interest, the waiver does not mean that the presumption in favor of the accused's counsel of choice is irrebuttable or that further judicial enquiry ends with the waiver. The trial court may reject the accused's waiver of a conflict-free attorney when the State shows the attorney has an actual conflict of interest or a serious poten-

tial for conflict of interest. *Id.* at 162–64, 108 S.Ct. at 1698–700, 100 L.Ed.2d at 150–52. When a trial court encounters such conflicts and finds that they

> impair[ ] the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.

*Id.* at 162, 108 S.Ct. at 1699, 100 L.Ed.2d at 151 (quoting *United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978)). In short, disqualification issues implicate not only the accused's Sixth Amendment rights but also a trial court's need to preserve the integrity of the process and to ensure a fair trial and just verdict.

■■■ B. *Scope of review.* Whether the facts show an actual conflict of interest or a serious potential for conflict of interest is a matter for the trial court's discretion. *Id.* at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152. Therefore our review of the district court's decision to disqualify Vanover's counsel is for abuse of discretion. *See Locascio,* 6 F.3d at 931 (interpreting *Wheat* as providing for abuse of discretion scope of review on disqualification issues). We find an abuse of discretion only when the party claiming such shows that the discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *State v. Ruble,* 372 N.W.2d 216, 218 (Iowa 1985).

■■■ Vanover raises a constitutional issue. We review constitutional issues de novo. *State v. Spencer,* 519 N.W.2d 357, 359 (Iowa 1994). *Wheat* modifies somewhat this review. The legal standard is actual conflict of interest or serious potential for conflict of interest. *Wheat* requires that appellate courts give deference to a trial court's factual findings leading to the legal conclusion whether there is or is not an actual conflict of interest or a serious potential for conflict of

interest. *See Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152 ("The evaluation of the facts and circumstances of each case under [the actual conflict or serious potential for conflict standard] must be left primarily to the informed judgment of the trial court."); *cf. State v. Rademacher,* 433 N.W.2d 754, 759 (Iowa 1988) (recognizing de novo review of constitutional claim, but giving deference to district court's factual determination on matter of prosecutorial intent to generate a mistrial).

Mindful of these principles, we turn to the record and consider the facts surrounding the district court's disqualification decision and its refusal to reinstate Stowers despite Vanover's waiver of conflict-free counsel.

C. *The merits.* Vanover raises numerous objections to the disqualification decision and the refusal to reinstate. Despite these objections, we think the decisive issue is this: Whether Stowers' actions in taking the statement from Waters created an actual conflict of interest or a serious potential for a conflict of interest. Before reaching this issue, we address several of Vanover's collateral issues.

1. *Whether the district court relied on the proper standard.* Vanover correctly asserts the district court made no mention of the appropriate "actual conflict" or "serious potential for conflict" standard announced in *Wheat.* He is also correct that the district court mentioned the "appearance of impropriety," a lower standard.

■■■ Because the district court did not mouth the magic words—actual conflict or serious potential for conflict—does not mean the court automatically abused its discretion. In our review we can determine whether the facts available to the court support the court's discretionary decision to disqualify Stowers and not reinstate him as Vanover's counsel. We emphasize, however, that trial judges should explain their discretionary decisions on the record. It would aid our review if they would make detailed findings of fact and state why the facts show an actual conflict of interest or a serious potential for conflict of interest.

■■■ When we carefully examine what the district court did say, we think the court did

not rely on the lesser appearance of impropriety standard but actually had in mind the serious potential for conflict of interest standard:

> But [taking the statements of codefendants Scoggins and Waters without the presence of their counsel] certainly raised in my mind the appearance of ... impropriety that maybe should be looked into....
>
> Beyond that, to put Mr. Stowers in a position of trying to represent this man with that in the back of his mind and with having to dance around when he examines these other witnesses who he talked with without the presence of counsel while they were codefendant[s] would be an injustice to this defendant, because he may not give his full effort in cross-examining or examining those witnesses.

Taken in context, the statement about appearance of impropriety—although a concern—was not the main concern of the court. Rather, the court was more concerned with the serious potential conflict of interest Stowers might have in trying Vanover's case.

■ Standing alone, an appearance of impropriety is not enough to justify disqualification, but it is a factor a trial judge may consider. *Wheat* is clear on this point: "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings *appear* fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698, 100 L.Ed.2d at 149 (emphasis added).

2. *Whether the district court's initial disqualification was procedurally unfair.* Vanover contends the district court initially disqualified Stowers "without warning, without hearing, and without a disqualification motion before it." These alleged procedural defects, Vanover argues, put him in the difficult position of having to ask the court to change its original ruling and improperly placed the burden of persuasion on him.

As recalled, Stowers himself raised the issue of disqualification in his motion to sever:

> The specter of the State calling Vanover's counsel as a witness on behalf of the State would result in a violation of Vanover's constitutional right to a fair trial.

... [I]t would be a violation of Vanover's Sixth Amendment right to counsel, including counsel of choice, to deny this motion because attorney Stowers may then be forced to move to withdraw.

As the State points out, Stowers himself alerted the court that his presence as a witness at the trial was inconsistent with his role as a defense attorney.

■ Moreover, a trial court has the authority and duty to enquire on its own into potential conflicts of interest. In *United States v. Coleman,* 997 F.2d 1101 (5th Cir. 1993), the appellate court concluded the trial court could disqualify counsel on its own motion, stating:

> [The defendant's] contention that the government did not follow the proper procedure for disqualification is irrelevant. The district court had the authority and duty to inquire *sua sponte* into whether counsel should not serve because of a conflict with another client. Such findings are within his prerogative.

*Coleman,* 997 F.2d at 1104. *Wheat* takes a similar position. *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698, 100 L.Ed.2d at 149 ("[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.").

*Coleman* also answers Vanover's lack of hearing argument:

> Finally, [the defendant's attorney] was not deprived of the opportunity to dispute his disqualification with the judge. [The defendant's attorney] presented his position both in open court and by means of a sealed *ex parte* affidavit that the court reviewed *in camera.* Additionally, after the initial order of disqualification, [the defendant's attorney] filed two motions to reconsider his disqualification, which the court addressed in a written order. Neither of [the attorney's] motions to reconsider alleges lack of notice, nor is there any evidence that the court lacked any relevant information in making his decision.

*Coleman,* 997 F.2d at 1104.

■ Similarly here, Stowers' pre-ruling arguments and Vanover's post-ruling hearing

provided Vanover adequate procedural protection and provided the district court adequate information to make its decision. At the severance hearing, both sides essentially agreed on the facts that caused the State to list Stowers as a witness. Their only disagreement was about how to remedy Stowers' predicament. At first, Stowers conceded he would be forced to withdraw if his testimony was necessary. Later he backed away from this position and insisted he was going to represent Vanover until forced to withdraw.

Vanover's burden of proof argument is also without merit. The district court simply drew out the facts and made a decision. In doing so, the court imposed no burden of proof or persuasion on Vanover.

That brings us to what we earlier referred to as the decisive issue in this case.

3. *Whether Stowers' actions in taking Waters' statement created an actual or serious potential for a conflict of interest.* The State contends that by taking Waters' statement Stowers injected himself into Vanover's trial as a potential witness for the State and the defendant. Because he was a potential witness, the State argues, Stowers created the conflict that justified his disqualification.

As we said in *Killian,* "[a]ttorney disqualification challenges derive from ethical principles outlined in the code of professional responsibility for lawyers." *Killian,* 452 N.W.2d at 429. When the State listed Stowers as a witness, such action brought into play Iowa Code of Professional Responsibility for Lawyers DR 5–102(B). DR 5–102(B) provides:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or member of the firm may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client.

Under this rule, once Stowers learned that the State intended to call him as a witness against Waters, Stowers was obligated to withdraw if it appeared that his testimony was or might be prejudicial to Vanover.

The preliminary statement to the Iowa Code of Professional Responsibility for Law-

yers defines the purpose of the Ethical Considerations: "The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations."

Ethical Consideration 5–9 describes the inherent conflict in a lawyer assuming the role of counsel and witness:

Occasionally a lawyer is called upon to decide in a particular case whether the lawyer will be a witness or an advocate. If a lawyer is both counsel and witness, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. Conversely the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing the lawyer's own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

a. *The disqualification issue.* In deciding the disqualification issue, we must look at the facts and circumstances as they appeared to the district court when the issue first arose. In her statement to Stowers, Waters implicated herself in the crimes and exculpated Vanover. Stowers' testimony regarding the statement was therefore very favorable to the State's case against Waters in the upcoming joint trial of Waters and Vanover.

As mentioned, the disqualification issue first surfaced at the hearing on Vanover's motion to sever. The prosecutor, Waters' attorney, and Stowers attended the hearing. In addressing the district court, Waters' attorney characterized Waters' statement to Stowers as a "confession [that] was coerced either by Mr. Stowers or at the impetus of his client."

The prosecutor likewise characterized Waters' statement as a confession. Although he expressed a reluctance to call Stowers as a witness, the prosecutor indicated he probably

had to do so because Stowers' testimony would be very incriminating to Waters. The prosecutor also mentioned "the source of controversy" between Waters' attorney and Stowers. He attributed the cause of that controversy to Stowers' actions in interviewing Waters without the consent of her attorney.

Obviously, Waters' attorney would have a strong interest in discrediting Waters' statement as coerced either by Stowers or by Vanover or even by both. Waters' attorney would also have an interest in exploiting Stowers' questionable conduct in taking Waters' statement without his consent. *See* DR 7–104 (prohibiting attorney's communication with persons of adverse interests to the attorney's client).

At this point Stowers' credibility became an issue. Even Vanover and his new counsel recognized the credibility issue. At the February 21 hearing, new counsel put Vanover on the stand to waive any conflict of interest problem that might arise if Stowers were to testify. By such a waiver, Vanover apparently hoped to convince the court to reinstate Stowers as his attorney.

Vanover testified that he was aware the State had listed Stowers as a witness to lay a foundation for the tape-recorded statement Stowers took from Waters. Vanover also acknowledged he had talked to Stowers about this. Counsel then delved into the credibility problem:

Q. Do you realize that it would be possible then that Mr. Stowers not only would be representing you as your attorney but could be called as a witness during your trial? A. Yes, I know that.

. . . .

Q. Do you understand that if [Stowers] were called as a witness during your trial that someone could then question his credibility and interest in this matter? A. Yes, I already know that, sir.

Q. Have you had full discussions with Mr. Stowers concerning this? A. Yes, I have.

Q. Why do you want Mr. Stowers to be your attorney? A. Because I am satisfied with the work he [has] done. . . . I don't have a problem with him getting up and testifying in my behalf. It may look bad on me by him being called as a witness. It may attack his credibility. But I am still satisfied with the work he [has] done and performed. And I still want [him] to continue as my attorney.

When the prosecutor cross-examined Vanover, he homed in on the credibility problem Stowers would face if Stowers continued as Vanover's counsel:

Q. Mr. Vanover, if the situation were to arise where Mr. Stowers was placed in a jam—and let me explain that. If a situation arose where he found himself in a position where people were accusing him of being unethical, of doing something that he shouldn't do as a lawyer, and that conflicted with your right for him to represent you fully and to answer questions truthfully for you, if there is a conflict now, if he had to answer a question one way that would hurt him and another way that would hurt him but help you, you understand my situation here, who do you think he'd represent more zealously or with more emphasis, himself or you? Do you understand my question? A. No, I don't understand what you're—

. . . .

Q. If Mr. Stowers had to choose between himself and you in a situation where he had to help either himself or you, who do you think he would pick? A. Well, that's a question hard for me to answer, but I would still rather take him as my attorney. If it hurts me, I am just hurt. If it would help me I am helped. But from his past experience as my lawyer, I would still rather have him. I would take that chance.

In a recent federal case, the court found—in similar circumstances—a conflict of interest sufficient to justify (1) a disqualification of defense counsel and (2) a rejection of the client's proffered waiver of conflict-free counsel. *United States v. Arrington*, 867 F.2d 122, 129 (2d Cir.1989). Defense counsel had obtained an affidavit from a government informant that the informant had no knowledge that defense counsel's client was involved in any wrongdoing. Testifying outside the presence of the jury, the informant recanted the affidavit and testified that de-

fense counsel had threatened him. On the conflict of interest issue, the court said:

> The conflict here is "not the more usual one of multiple representation." Rather, counsel has been placed in the position of having to worry about allegations of his own misconduct. . . .
>
> . . . .
>
> Thus, if the court had accepted [the accused's] proffered waiver of conflict-free counsel, [the accused] would have been represented by counsel encumbered with a strong incentive to conduct the trial in a manner that would minimize counsel's own exposure.

*Id.* (citation omitted).

It was likely that Stowers would be a State witness against Waters. Waters' attorney would likely attempt to discredit Waters' confession to Stowers with questions to Stowers insinuating that he or his client or both had coerced Waters into confessing. Waters' attorney would also likely call into question Stowers' failure to contact him before taking Waters' statement and would likely leave the jury with the impression that such conduct was unethical. Any questions along these lines would severely damage Stowers' credibility and likely prejudice Vanover's cause in the eyes of the jury. Such an attack on Stowers' credibility would leave Stowers with an incentive to conduct the trial in a manner that would minimize his own exposure at his client's expense. At a minimum, there existed a serious potential that Stowers' loyalties would thus be divided.

 The potential conflict as we have outlined was serious because it might imperil Vanover's right to adequate representation, jeopardize the integrity of the trial process, and diminish the prospect of a fair trial with a just, reliable result. *See State v. Miller*, 160 Wis.2d 646, 659, 467 N.W.2d 118, 122–23 (1991) (listing the dangers to clients and the judicial process from attorneys operating with divided loyalties). We conclude the district court was well within its discretion when it disqualified Stowers and rejected Vanover's proffered waiver of conflict-free counsel.

b. *The refusal to reinstate issue.* As mentioned, Waters eventually reached a plea agreement with the State and agreed to tes-

tify against Vanover. This prompted Vanover to seek a reconsideration of the disqualification ruling. Vanover argued that Waters was no longer a codefendant and for that reason the State had no need to use Stowers as a witness.

The State argued that Stowers remained a potential rebuttal witness for the State, as well as a potential witness for Vanover. The district court reconsidered its disqualification ruling and denied reinstatement. In doing so, the court said:

> When I originally ruled on this somebody asked me . . . whether it was a violation of one of the Code of Ethics for lawyers to do what [Stowers] did. . . . [I]t certainly raised in my mind the appearance of . . . impropriety that maybe should be looked into if somebody gets all of the facts. . . .
>
> Beyond that, to put Mr. Stowers in a position of trying to represent this man with that in the back of his mind and with having to dance around when he examines these other witnesses who he talked with without the presence of counsel while they were co-defendant[s] would be an injustice to this defendant, because he may not give his full effort in cross-examining or examining those witnesses.
>
> And for these reasons and for all the reasons argued by the county attorney, I am not going to change my opinion. I think the ruling was correct then and I think it's still correct.

Once Waters recanted her statement to Stowers and agreed to testify against Vanover, DR 5–102(A) came into play. DR 5–102(A) provides:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a member of the firm ought to be called as a witness on behalf of the client, the lawyer shall withdraw from the conduct of the trial and the firm, if any, shall not continue representation in the trial, except that the representation may continue and the lawyer or a member of the firm may testify in the circumstances enumerated in DR 5–101[ (D) ] (1) through (4).

The exceptions referred to include the following:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or the firm as counsel in the particular case.

DR 5–101(D)(1)–(4).

■ The application of DR 5–101(A) to Stowers after Waters recanted depends on the meaning of the phrase "ought to be called as a witness on behalf of the client." "The test is whether the attorney's testimony could be significantly useful to his client; if so, he ought to be called." *MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1208 (S.D.N.Y.1981).

■ There are strong policy reasons behind DR 5–101(A). The rule protects the parties' interests and the reputation of the legal profession as a whole. *Id.* These interests are spelled out in EC 5–9, which we previously discussed.

DR 5–102(A) underscores the potential conflict of interest facing an attorney in this situation. For example, the attorney who may be eager to participate in the litigation might not withdraw and testify even if the attorney's testimony might help the client. Additionally, the attorney might not withdraw and testify solely because the client insists on the attorney's continued representation. *Id.* As EC 5–9 explains, the ethical canons seek to avoid such conflicts by keeping separate the roles of attorney and witness. *Id.*

DR 5–102(A) also protects the interests of the adverse party. For example, a jury might see the attorney as having special knowledge of a case and for this reason give the testifying attorney's arguments more weight than they deserve. *Id.* Also, "[h]aving seen the attorney take an oath on the witness stand, the jury might accord testimo-nial weight to his closing arguments, or might simply place undue weight on the testimony of a court officer." *Id.*

On the other hand, "as EC 5–9 suggests, the adverse party's attorney may, for reasons of professional courtesy and court etiquette, be handicapped in challenging the testimony of another attorney." *Id.* There was some undertone of that here. When the disqualification issue first surfaced, the prosecutor acknowledged to the court that he was reluctant to call Stowers as a witness. At the trial, the prosecutor agreed not to question Stowers about possible unethical conduct in obtaining Waters' statement.

The bar's reputation is at stake when an attorney takes the stand on behalf of the client and the attorney's credibility is attacked. Jurors and other observers "might speculate whether counsel has compromised his integrity on the stand in order to prevail in the litigation." *Id.*

[26, 27] DR 5–102(A) prevents a party from choosing "between the attorney's testimony and the attorney's representation." *Id.* at 1209. All doubt is resolved in favor of the attorney's testimony and against the attorney's representation. *Id.* The client can get other counsel but "cannot obtain substitute testimony for a counsel's relevant, personal knowledge." *Id.* The rule also makes no provision for allowing the client to waive the rule's protection by promising not to call the attorney as a witness. *Id.*

■ All of these policy considerations are compelling reasons supporting the district court's decision not to reinstate Stowers. Stowers' testimony was vital to Vanover's defense; impeaching Waters' testimony was Vanover's best chance to an acquittal. Stowers obviously believed this because he conceded he took Waters' statement to impeach her if she ever recanted.

■ Even if Stowers had not testified and remained in the case as counsel, he would have had the status of an unsworn witness. An attorney acts as an unsworn witness when the attorney's relationship to the client results in the attorney having first-hand knowledge of events presented at trial. *Locascio,* 6 F.3d at 933. Such a potential

status is a reason for disqualification under DR 5–102(A) for several reasons. *Id.* First, counsel may be "constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client." *Id.* Second, counsel's role "as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear on oath or be subject to cross-examination." *Id.*

By remaining in the case and not testifying, Stowers would have had to impeach Waters' testimony with the statement he took. Stowers might not have cross-examined her as vigorously as Vanover's new counsel did for fear she might suggest Stowers coerced her to give the statement or for fear she might suggest Stowers knew Vanover coerced her to give the statements. In either case, there was a danger of serious prejudice to Vanover's case.

On the other hand, Stowers' role as an advocate rather than as an actual witness might have given his client an unfair advantage. In final argument, Stowers could have argued that Waters told the truth in her statement to him and lied at trial. Stowers would, of course, be giving credibility to a statement he took without ever having been cross-examined under oath about the circumstances surrounding the statement.

Ultimately, Stowers was Vanover's star witness. Stowers testified about the recorded confession he took from Waters, about her call to him to give the statement, and the circumstances surrounding the interview. Through Stowers, Vanover's counsel was able to introduce the transcript of Waters' statement to Stowers and was able to play the tape of that statement for the jury.

As mentioned, Stowers testified that Waters called him. Significantly, the substance of that call was not in her statement and was particularly damaging to the State's case against Vanover. On this matter, Stowers testified as follows on direct examination:

Q. Did you call her or did she call you? A. She called my office.

Q. Do you know what the purpose of her call was? A. She stated she wanted to come in for an interview.

Q. Do you know why she wanted to come for an interview? A. She stated that the reason she wanted to come in for an interview was essentially to clear this matter up, because she thought that the charges against Obell were bullshit. That was her word.

Stowers' impeachment testimony became even more important and compelling when defense counsel extracted admissions from Waters that she wrote a letter telling Vanover she would hurt him for being unfaithful to her.

■ Contrary to Vanover's contention, Stowers testified to considerably more than foundational facts surrounding Waters' statement. *See* DR 5–101(D)(2) (stating exception to DR 5–102(A) for testimony relating solely to a matter of formality). From our review we are also convinced that refusing to reinstate Stowers worked no substantial hardship on Vanover because of any "distinctive value" Stowers might have brought to the case. *See* DR 5–101(D)(4) (exception to DR 5–102(A) where disqualification would work substantial hardship on the client because of lawyer's distinctive value as counsel in the case).

■ The substantial hardship exception in DR 5–101(D)(4) is narrowly construed. *MacArthur*, 524 F.Supp. at 1210. Standing alone, substantial hardship is insufficient to permit continued representation. *Id.* The exception in DR 5–101(D)(4)

expressly qualifies the hardship that must be shown to permit continued representation as one that arises "because of the distinctive value of the lawyer or his firm as counsel in the particular case." For example, in a highly technical case, an attorney might have acquired unique expertise with respect to the matters in dispute, and no substitute counsel could supply the client with comparably adequate representation; in such a case, the serious prejudice to the client, when weighed against the significance of the testimony, might justify invocation of the exception.

Similarly, a long-standing professional relationship could conceivably create a situation where an attorney has an extraordinary and irreplaceable familiarity with the affairs of his client.

*Id.* at 1210–11 (citation omitted).

This case was not highly technical. Although Stowers had represented Vanover in the past, the record does not show the professional relationship was so long-standing as to give Stowers an "extraordinary and irreplaceable familiarity" with Vanover's affairs. Simply put, Stowers did not have distinctive value as trial counsel.

Significantly, Vanover does not challenge the effectiveness of replacement counsel. We can understand why. The record shows Vanover received more than adequate representation. *See Locascio,* 6 F.3d at 932 (holding that effectiveness of replacement counsel does not justify an otherwise unwarranted disqualification; nevertheless, fact that defendant received more than competent representation was an additional consideration strongly supporting district court's disqualification order).

We do not share the appellate defender's fear that our decision will chill defense counsel's investigations in the future. The appellate defender, himself, suggests the solution to the dilemma posed in this case: Simply interview witnesses in the presence of third parties. *See* Standards for Criminal Justice § 4–4.3 commentary at 4.59–60 (1980).

We do, however, share the appellate defender's concern about the possibility that the State may manufacture a conflict to eliminate a formidable opponent. In *Wheat,* the Court cautioned trial courts to consider this possibility along with all the other factors in deciding disqualification issues. *Wheat,* 486 U.S. at 163, 108 S.Ct. at 1699, 100 L.Ed.2d at 151. We urge trial courts to do the same and to explore this possibility on the record when deciding disqualification issues. We are convinced there was no such attempt in this case.

For all these reasons, we conclude the district court did not abuse its discretion when it refused to reinstate Stowers as Vanover's counsel. The potential for serious conflict of interest still remained.

### III. *Sentencing.*

Vanover contends the district court failed to exercise its discretion when it doubled his sentence under Iowa Code section 124.411(1). He also contends the court considered an impermissible factor in selecting the sentence.

**A.** *Failure to exercise discretion.* Iowa Code section 124.411(1) is a habitual drug offender provision. The statute pertinently provides that

[a]ny person convicted of a second or subsequent offense under this chapter may be punished by imprisonment for a period not to exceed three times the term otherwise authorized. . . .

Iowa Code section 124.413 provides that anyone sentenced pursuant to section 124.401(c) "shall not be eligible for parole until the person has served a minimum period of confinement of one-third of the maximum indeterminate sentence prescribed by law."

Vanover was convicted a second time of violating section 124.401. Thus, the district court had discretion under section 124.411(1) to enhance Vanover's punishment up to three times the sentence otherwise authorized. In addition, Vanover would be required to serve a minimum of one-third of his maximum sentence.

The State asked the district court to triple Vanover's sentence, but the court rejected that request. Instead, the court doubled Vanover's sentence.

Vanover thinks the district court assumed that all it was permitted to do under the enhancement statute was either to double or to triple Vanover's sentence. Vanover argues that "[n]othing in the record suggests the court recognized its full sentencing options under section 124.411(1), or otherwise exercised its discretion to reject those options." He therefore asks that we vacate his sentence and remand with directions that the district court consider the full range of sentencing options under section 124.411(1).

We agree with the State that "[n]othing in the record supports Vanover's conjecture that the district court was unaware that it could impose intermediate sentencing in-

creases under section 124.411(1)." Section 124.411(1) is plain in its meaning: The district court could have enhanced Vanover's sentence by any amount of time as long as the increase did not exceed three times the sentence authorized. Nothing in the record suggests the district court interpreted the statute otherwise.

Defense counsel recommended a straight ten-year sentence. As the State points out, defense counsel did not suggest that the court might order, for example, an additional five years to the authorized sentence. Had counsel done so and had the court replied that it could only double or triple the sentence, the record would have been clear that the court had not interpreted the enhancement statute correctly.

 The record as it now stands therefore fails to show affirmatively that the court failed to understand its full range of discretion under section 124.411(1). Vanover was required to provide a record affirmatively showing how the district court abused its sentencing discretion. *See State v. Mudra*, 532 N.W.2d 765, 767 (Iowa 1995) (holding that defendant has obligation to provide appellate court with a record affirmatively disclosing the error relied on). Moreover, the district court was not required to give its reasons for rejecting particular sentencing options. *State v. Loyd*, 530 N.W.2d 708, 713–14 (Iowa 1995) (holding that generally sentencing court is not required to give its reasons for rejecting particular sentencing options).

 A sentencing decision is cloaked with a strong presumption in its favor. *Id.* at 713. Vanover has failed to overcome that presumption here. We therefore cannot say the district court never exercised its discretion and for that reason abused it as Vanover argues.

 B. *Impermissible sentencing factor.* Defense counsel argued against enhancement of Vanover's sentence. In doing so, counsel told the court that Vanover would likely serve four years in prison and that would be "sufficient punishment." The court rejected these pleas for leniency in the following colloquy with defense counsel:

THE COURT: [I] did not follow the county attorney's recommendation that we triple this. However, I am doubling the punishment. And I am doing that for several reasons, I guess.... Your client was convicted of a drug offense in this court when he was on parole from a prior offense.... I think the public needs to be protected from further criminal activity of your client. And to do anything less than I am doing would seriously depreciate from the seriousness of the offense. Further, that I hope this is a way to rehabilitate your client. *You say he's going to do four years if he had just got the ten. Well, he's going to do six with this. And that's going to be the order.*

(Emphasis added.)

Vanover thinks the italicized portion of the court's statement implies that the court selected a longer sentence because it wished him to serve a longer minimum sentence than he might otherwise serve under existing parole guidelines. He insists this is an impermissible attempt to lengthen the sentence because of parole factors.

Taking the district court's statements in context, we think, as the State suggests, that the court was merely explaining the application of the mandatory minimum to the increased sentence it imposed. Defense counsel calculated the mandatory minimum Vanover would have to serve, and the court was merely responding to that calculation. Moreover, in the first part of the colloquy, the court gave several cogent reasons for doubling the sentence. All of these reasons are proper sentencing factors. We therefore do not view the colloquy as an intent on the part of the court to interfere with Vanover's parole eligibility.

We conclude Vanover has failed to demonstrate that the district court abused its discretion by considering an impermissible sentencing factor.

IV. *Disposition.*

We have considered all of Vanover's arguments whether or not addressed, and we find them without merit. Because we conclude the district court neither abused its discre-

tion on the attorney disqualification issue nor on the sentencing issue, we affirm.

**AFFIRMED.**